UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LINDA IDELL JEFFERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | No. 09-C-6225 |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | Magistrate Judge Arlander Keys |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Linda I. Jeffers, moves this Court for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse or remand the final decision of the Commissioner of Social Security ("Commissioner"), who found that she was not entitled to a period of disability and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§ 416(i), 423 (West 2010). Defendant Commissioner has filed a cross-motion for summary judgment. For the reasons set forth below, the Court grants Plaintiff's motion, denies Defendant's cross-motion, and remands the decision of the Commissioner.

### *PROCEDURAL HISTORY*

On August 22, 2005, Ms. Jeffers filed an application for a DIB, alleging a disability onset date of August 1, 2003. R. at 15. Ms. Jeffers alleged that several illnesses, injuries, and conditions limit her ability to work, including "[d]epression, severe osteo-arthritis, knee problems[,] back problem, ademia [sic], panic attacks, fybromiglia [sic], diabetes, hernia [sic]

1

disc, constance [sic] pain wear a patch, ADD." R. at 198. She indicated that she stopped

working because she "couldn't stand or lift due to pain." *Id.* Ms. Jeffers' "date last insured"

("DLI") – the last date she was eligible to remain insured – is September 30, 2003. R. at 16.

Ms. Jeffers' application was denied initially on November 29, 2005, and upon

reconsideration on May 25, 2006. R. at 15. Ms. Jeffers timely filed a Request for Hearing

before an Administrative Law Judge on July 24, 2006. *Id.* A hearing was held on January 17,

2008. R. at 74. Ms. Jeffers was neither present nor represented. *Id.* However, medical expert

Dr. Larry Kravitz was present and gave testimony. *Id.* A subsequent hearing was held on May

1, 2008. R. at 29-79. Ms. Jeffers appeared, was represented by counsel, and testified. *Id.* At

this hearing, medical expert Dr. Robert Marques and vocational expert Thomas Grzesik appeared

and testified. *Id.* Administrative Law Judge ("ALJ") Denise McDuffie Martin issued a decision

by notice dated August 6, 2008, finding Ms. Jeffers not disabled. R. at 15-24.

Ms. Jeffers timely filed a request for review of the decision with the Social Security

Administration's Appeals Council. R. at 9. The Appeals Council's July 7, 2009, denial of Ms.

Jeffers' request for review, R. at 3, constitutes the final administrative decision by the

Commissioner. 20 C.F.R. § 404.981 (2010). Ms. Jeffers was granted an extension by the

Appeals Council giving her until October 7, 2009, to file an action in federal court challenging

the ALJ's decision. R. at 2. This action seeking review of the ALJ's decision was timely filed in

federal court on October 5, 2009.

## FACTUAL HISTORY

A. *Plaintiff's Background*

Ms. Jeffers was born on August 16, 1955, and was forty-eight years old at the time of her

alleged disability onset date. R. at 23. At the time of the May 1, 2008, hearing, Ms. Jeffers was

in the process of a divorce and had an eleven-year old son living with her. R. at 36. Ms. Jeffers testified that she has an associate degree in social work. R. 36. Prior to 1998, Ms. Jeffers worked as a supervisor at a restaurant for sixteen years. R. at 40. In this job, Ms. Jeffers worked twelve hours a day, five days a week supervising kitchen staff, as well as cooking, operating the cash register, and preparing food in the morning. R. at 199. From 1998 to July 2002, Ms. Jeffers was the owner/operator of an antiques store; however, she closed the store because she was "too sick." R. at 39. In 2003, Ms. Jeffers began working at a furniture store, but was only able to work two to three days a week for three or four hours a day. R. at 38. Her responsibilities at the furniture store included answering the phone while the owner was away, and waiting on customers. *Id.* Ms. Jeffers stopped working on August 1, 2003. R. at 198.

Ms. Jeffers' sister-in-law, Donna Jarvey, participated in a telephone interview with a representative of the Social Security Administration on October 27, 2005, in order to submit an Activities of Daily Living ("ADL") report for Ms. Jeffers. R. at 211-213. The ADL report notes that, in 2002, Ms. Jeffers cut back from working seven days a week at her antiques store to only working three days a week "because some days she was not able to get out of bed due to her medical problems." *Id.* Ms. Jarvey explained that good days "would . . . be followed by days when she was too exhausted to do anything. On [these days], [I] helped out by taking [Ms. Jeffers'] son to and from school, cooking and getting any needed groceries." *Id.* The ADL report indicates that, "Donna is not able to provide a specific description of the claimants [sic] day to day functioning during 2003, but states the claimant was bothered by fibromayalgia [sic] that caused her to sometimes be exhausted. The claimant also had problems with her back and knees." R. at 212. Ms. Jarvey indicated that in 2003, "it was necessary to help [Ms. Jeffers] . . .

3

five to seven days a week sometimes spending up to 4 [sic] nights a week there." *Id.* The ADL report continued,

> When directly questioned regarding depression and panic attacks, Donna stated the claimant has had both for as long [sic] a long time. Donna explained that the claimant's problem with fibromyalgia got worse when the depression was worse. Donna is not able to say how often in 2003 the claimant was not able to function due to depression worsening the fibromyalgia or how often the claimant had the panic attacks, but states she was aware of the claimant taking medication for depression and panic attacks.

R. at 213.

B. *Medical Evidence*

1. *St. James Hospital and Health Centers*

Dr. Churl-Soo Suk, an attending physician at St. James Hospital and Health Centers, performed arthroscopic surgery on Ms. Jeffers' right knee on March 8, 2002, R. at 271, and on her left knee on September 13, 2002. R. at 275. Dr. Suk indicated in notes for both surgeries that "[t]he patient did well and left the operating room in good condition." R. at 272, 276. Ms. Jeffers subsequently injured her left knee on April 20, 2003, while trying to hide Easter eggs. R. at 310. Dr. Suk indicated that a magnetic resonance imaging ("MRI") scan of the left knee performed shortly thereafter "showed prominent degenerative changes involving tibiofemoral articulation. . . . Also, there are signs of lateral meniscus tear. . . ." *Id.* Dr. Suk performed another arthroscopic surgery on her left knee on May 16, 2003. R. at 316. Again, Dr. Suk noted that "[t]he patient did well and left the operating room in good condition." R. at 317.

Just prior to the third knee surgery, on May 13, Ms. Jeffers had an MRI scan of her lumbar spine. R. at 301. Dr. Charisa Spoo's impression was "[m]inimal asymmetrical disc bulge seen towards the left L5-S1 level with a possible medial left S1 nerve root impingement," and, "[m]inimal facet arthritic changes lower lumbar spine." *Id.*

4

Ms. Jeffers was admitted to St. James Hospital and Health Centers Emergency Room on August 27, 2003, at 1:14 am. R. at 280. Ms. Jeffers complained of numbness in her left arm and "tingling up to [her] neck area [for the] past 2 [sic] days." R. at 285. The results of a computed tomography ("CT") scan, R. at 290, as well as a chest x-ray, R. at 289, were not remarkable. R. at 289-290. The attending physician, Dr. Parmar, wrote that his "clinical insight/diagnostic impression" was that Ms. Jeffers had suffered an "anxiety attack." R. at 284. The St. James Hospital and Health Centers discharge report also listed Ms. Jeffers' diagnosis as "anxiety." R. at 288.

### 2. *St. Margaret Mercy Healthcare Centers*

On February 23, 2004, Ms. Jeffers called Dr. Ning Sun "complaining about new onset of left face and left arm heaviness and vision blurring and unsteadiness." R. at 360. Dr. Sun told Ms. Jeffers to visit the Emergency Room at St. Margaret Mercy Hospital for a CT scan of her head. *Id.* Dr. Sun noted that, "In addition[, Ms. Jeffers] described that she is under a lot of stress. . . . She has low back pain but no radiating to the legs." *Id.* Dr. Sun examined Ms. Jeffers on February 24, 2004, and her impression was that "[Ms. Jeffers'] examination was unremarkable. She did have MRI in the past with subcortical lesion. Transient ischemic attack, CNS demyelinating disease, as well as seizure disorder should be ruled out." R. at 361.

### 3. *Chiropractic Physician: Dr. Michael Szarmach*

From 1985 until May 2003, Ms. Jeffers was treated by a chiropractic physician named Dr. Michael Szarmach for various musculo-skeletal conditions, including, "spraining type injuries involving all spinal regions, cervical, thoracic, and lumbar." R. at 660. In a July 2, 2008, letter submitted for the record, Dr. Szarmach indicated that Ms. Jeffers has developed degenerative disc disease over the years involving both her cervical and lumbar spinal regions, as

well as fibromyalgia. *Id.* Dr. Szarmach wrote, "These conditions have been present since the year 2000. She has also subsequently developed degernative arthritic conditions involving her cervical and lumbar spinal regions, bilateral hips and knee joints." *Id.* Dr. Szarmach noted that, as of May 2003, Ms. Jeffers "was no longer responding to a combination of oral medications . . . and conservative physical medicine rendered by myself. She was referred to a pain management specialist for injections and additional medication for her conditions." *Id.* Although Dr. Szarmach had not seen Ms. Jeffers since May 2003, he indicated that, at that time, "she was fairly incapacitated, and unable to work or perform a variety of ADL's at that time, due to the severity of her numerous conditions." R. at 661.

4. *Treating Physician: Dr. Zaki Anwar*

Dr. Zaki Anwar is a pain management specialist who has treated Ms. Jeffers since 2003. R. at 380 – 454. In 2003, Ms. Jeffers had appointments with Dr. Anwar on May 29, June 2, June 5, June 9, June 26, June 30, July 14, August 14, August 18, September 29, October 13, October 27, November 3, November 17, November 24, and December 15. R. at 382-384. In June 2003, Dr. Anwar indicated that Ms. Jeffers suffered from left lumbar radiculopathy (a disease of the nerve roots), sciatica, L5-S1 disc protrusion with a severe lumbar strain, severe bilateral sacroilitis, and facet arthropathy. R. at 453.

Dr. Anwar administered transforaminal epidural steroid injections from June 2003 through May 2008. R. at 380-454, 605-622. Dr. Anwar's August 14, 2003, surgery notes indicate, "[C]onsidering the patient's excruciating pain, which get relief only for six to eight weeks after this injections [sic], at this point probably a conservative type of treatment would be a better option." R. at 451. Dr. Anwar's September 29, 2003, Operative Report notes, "The patient had a few transforaminal lumbar epidural steroid injections with significant relief of the

6

pain, but this pain [sic] is very short lasting. It did help her with her leg pain, but it did not help much with her back pain and the left upper sciatic leg pain." R. at 449.

On September 26, 2006, Dr. Anwar wrote a letter of medical necessity on behalf of Ms. Jeffers. R. at 617-618. In the letter, Dr. Anwar indicated that Ms. Jeffers suffered from "chronic back pain, chronic neck pain[,] as well as chronic leg pain." R. at 617. He listed seven current diagnoses, including cervical disc displacement, cervical strain, cervicogenic headache, lumbar disc displacement, lumbar spinal stenosis, lumbar strain, and sciatica. *Id.*

Dr. Anwar also submitted a physical residual functional capacity (RFC) assessment for Ms. Jeffers on July 7, 2008. R. at 664-667. Dr. Anwar indicated that Ms. Jeffers would be limited to standing and walking for less than a half-hour in an eight-hour day. R. at 664. Likewise, Dr. Anwar noted that Ms. Jeffers should sit for no longer than two hours in total in an eight-hour day, with no more than a half-hour of sitting without interruption. R. at 665. Dr. Anwar also recommended that Ms. Jeffers take more than two periods of rest during an eight-hour period, each for at least one hour, in a reclining position. R. at 666. The medical findings that Dr. Anwar indicated as the basis for his assessment of Ms. Jeffers' rest requirements are difficult to read, but appear to be "lumbar disc herniation" and "lumbar radiculopathy." *Id.*

5. *Treating Physician: Dr. Abdul Faisal*

Dr. Faisal began treating Ms. Jeffers in summer 2004. R. at 652. In his initial assessment on June 28, 2004, Dr. Faisal noted that Ms. Jeffers presented with "symptoms that are strongly suggestive of a recurrent Major Depressive Disorder and Adult Attention Deficit Disorder." R. at 656. Dr. Faisal prescribed Effexor and Ritalin for Ms. Jeffers, instructed that she continue taking Xanax and Ambien, and asked her to continue seeing her therapist regularly. R. at 656-657. Dr. Faisal submitted a letter for the record dated October 10, 2007, in which he again

reported that Ms. Jeffers suffered from Major Depressive Disorder and Attention Deficit Disorder. R. at 509. Dr. Faisal indicated that "Her response to treatment has been fair although she continues to struggle" with issues related to her medical conditions. *Id.*

### 6. *Treating Physician: Gary Marcotte, D.O.*

Dr. Marcotte is a family physician who has treated Ms. Jeffers since at least September 2002. R. at 456. At a visit to Dr. Marcotte's office on October 16, 2002, Ms. Jeffers was found to have depression, anxiety, and elevated blood pressure. *Id.* On May 12, 2003, just prior to Ms. Jeffers' second surgery on her left knee, she complained of back pain as well as pain running down her left leg. R. at 459. Dr. Marcotte's assessment included internal derangement of the left knee and sciatica. *Id.*

At visits with Dr. Marcotte on June 20, July 7, and August 21, 2003, Ms. Jeffers complained of a mass in her left lower neck area. R. at 460-462. However, after Dr. Marcotte referred Ms. Jeffers to another physician for a physical examination, that doctor indicated, "There is no dominant mass or lymphadenopathy which is present at that point in time. There is nothing that I could obtain a biopsy of to help demonstrate the patient's question of possible Hodgkin's disease at this point in time. . . . By my clinical exam there is nothing that clinically supports Hodgkin's disease." R. at 467. Dr. Marcotte also referred Ms. Jeffers to Dr. Kevin Fagan, a neurologist, after episodes of numbness in her arms and face. R. at 472. Dr. Fagan evaluated Ms. Jeffers on August 28, 2003, and concluded, "My impression is that this lady has a normal exam but had a few spells that I had hoped were hyperventilation related." R. at 473.

Dr. Marcotte submitted both physical and mental RFC assessments of Ms. Jeffers. R. at 510-521. For the physical assessment, Dr. Marcotte indicated that Ms. Jeffers should be limited to a total of two hours of standing and walking in an eight-hour day, and that she should spend

no more than a half-hour standing and walking without interruption. R. at 511. Similarly, Dr. Marcotte indicated Ms. Jeffers should spend no more than a total of one hour sitting in an eight-hour day. R. at 513. He also noted that Ms. Jeffers requires more than two periods of rest in a reclining position during an eight-hour period, for thirty minutes to one hour per rest period, with her legs elevated above the heart. R. at 515. Dr. Marcotte wrote "swelling-positional" as the medical finding upon which he based his assessment of her resting needs. *Id.* On the mental RFC assessment, Dr. Marcotte checked the "Unlimited/Very Good" boxes for Ms. Jeffers' ability to "follow work rules," "relate to co-workers," and "deal with the public." R. at 518. He also marked "Good" for her ability to "function independently." *Id.* However, he checked "Fair" for her ability to "use judgment," and "deal with work stresses." *Id.* Dr. Marcotte also checked the "Poor None" box for Ms. Jeffers' ability to "maintain attention/concentration." R. at 519. Similarly, he checked "Poor/None" for her ability to understand, remember and carry out "simple," "detailed but not complex," and "complex" job instructions. *Id.*

### 7. *Clinical Social Worker: Shirley P. McDonald*

Shirley P. McDonald is a licensed clinical social worker who worked with Ms. Jeffers during the periods 1994 to 1998, and from 2004, until the time of the hearing. R. at 326. Ms. McDonald submitted a letter regarding Ms. Jeffers for purposes of the record on November 1, 2005. *Id.* Ms. Jeffers worked with Ms. McDonald "to alleviate her struggle with depression, panic attacks, ADD[,] and her on-going pain, as well as her inability to maintain strong healthy relationships over time . . . ." *Id.* Although Ms. McDonald did not treat Ms. Jeffers during the relevant time period for purposes of the disability claim, Ms. McDonald reasoned, "The conditions you list as her complaints are known to be long standing and fairly resistant to intervention, therefore, I feel comfortable discussing her ability to perform during that time

9

period based on her functioning prior to and since that time period." *Id.* Addressing Ms. Jeffers' condition as of the time of her letter, Ms. McDonald wrote,

> She does take medication for ADD and feels this has been a real help to her. Her depression is omnipresent, but somewhat controlled unless too many demands are made upon her; at such a juncture (which occurs nearly on a daily basis) she tends to place blame on others, clouding her ability to make adjustments in her own behaviors.

*Id.*

Ms. McDonald indicated that "[t]he real physical pain she endures is indeed often exhausting and prevents her from accomplishing identified goals." *Id.* She concluded that "given the persistence of the complaints she had prior to [the period January 1, 2002 to September 30, 2003], and since then, I am quite comfortable in interpolating that she would have had significant difficulties managing her interpersonal, physical and financial difficulties during that time as well." R. at 327.

### 8. *State Agency Medical Advice*

Dr. Reynaldo Gotanco completed a medical evaluation of Ms. Jeffers' disability allegations on November 28, 2005. R. at 378-379. Dr. Gotanco recommended denying the claim, explaining, "There is insufficient medical evidence in file to establish the severity of the claimant's condition before her DLI of 9/03." R. at 379. Likewise, in a November 29, 2005, "Psychiatric Review Technique," Dr. Travis Terry concluded, "There is insufficient [medical evidence of record] prior to DLI to make a determination." R. at 376. On reconsideration in May 2006, Helen Appleton, Ph.D., wrote that "[t]here continues to be insufficient [medical evidence of record] in file." R. at 507-508.

## C. *Testimony*

On January 17, 2008, Medical Expert Dr. Larry Kravitz testified before ALJ Martin at a hearing held in Oak Park, Illinois. R. at 72-79. Because Ms. Jeffers was unable to attend the January 17, 2008, hearing, R. at 74, a subsequent hearing was held on May 1, 2008, in Oak Park, Illinois, where Ms. Jeffers, Medical Expert Dr. Robert Marques, and Vocational Expert Thomas Grzesik all testified before ALJ Martin. R. at 29-71.

### 1. *Ms. Jeffers' Testimony*

Ms. Jeffers testified that she has a history of mental health issues stemming from a suicide attempt after being raped at age nineteen. R. at 42. According to Ms. Jeffers, following the attempt, she was sent to Matten Mental Institution for one week and subsequently received psychological treatment as well as medication. *Id.* Ms. Jeffers said she was again treated for psychological problems in the mid 1990s, and that she was taking anti-depressants at that time. R. at 43. She testified that in 1997, she moved to Georgia to get away from her family, that her psychological condition improved with the move, and that she stopped taking anti-depressants. *Id.*

Ms. Jeffers testified that she again suffered from psychological problems in late 2001 or early 2002, following her father's death and increased verbal abuse from her husband. R. at 47-48. Ms. Jeffers said she stopped working in 2002, because of her emotional state. R. at 48. Ms. Jeffers testified

> I didn't know [what] I was doing down there any more, and couldn't seem to -- I couldn't keep my books. I was in a lot of pain by then with my legs, I . . . already had my first and going on my second knee surgery. . . . I just -- I wasn't mentally able to do it.

*Id.* Ms. Jeffers also testified that, around that time, she would cry every two to three days, R. at 49, that she was gaining weight, *id.*, and that she wasn't sleeping. *Id.* Further, she indicated that her son was the only thing in her life she took pleasure in, *id.*, that she "pretty much [has not] gone anywhere since 2002," R. at 50, and that she is down to one friend. *Id.*

When initially asked whether her depression had improved or gotten worse with the treatment since 2002, Ms. Jeffers responded that "It improved for a long time." *Id.* However, the record indicates Ms. Jeffers may have been confused by the question because her next statement was, "My husband has [sic] lost his job and had a heart attack." *Id.* When Ms. Jeffers' attorney clarified that he was asking whether her depression had improved since the early 1980s, Ms. Jeffers responded that she is worse now. R. at 51. In response to a question from Dr. Marques, Ms. Jeffers testified, "I have good days . . . where I am up, and I am able to do some things, but then the next two days I'm in bed." R. at 58. Ms. Jeffers testified that she is currently taking medications for pain, depression, ADD, and to help her sleep. R. at 56-58. Ms. Jeffers indicated that "[she is] supposed to be taking Ritalin . . . ." R. at 56, for ADD, and that Ritalin "helps a lot." R. at 46. Ms. Jeffers testified that she takes Effexor and Ambien, and that she wears a pain patch. R. at 56-58.

Ms. Jeffers also testified that she has problems with her knees, back, and hips. R. at 51-55. She indicated that she has had one surgery on her right knee and three surgeries on her left knee. R. at 51. In addition, Ms. Jeffers noted, "[She is] supposed to have another [surgery] on [her right knee], but first [her doctors] want to replace [her] left knee." *Id.* Ms. Jeffers said she "[has] a lot of trouble with [her] legs swelling." R. at 58. Ms. Jeffers stated that she has used a cane "[o]ff and on" for the previous five years, and that Dr. Anwar had recently prescribed a new cane. R. at 37-38. Ms. Jeffers testified that her back has always bothered her, but around 2002,

the pain in her back "got to where [she] couldn't stand the pain any more." R. at 52. She said

that she received periodic surgical injections for her back pain, R. at 53, including during the

period when she worked part time at the furniture store in 2003. R. at 55. However, Ms. Jeffers

testified that at her job in the furniture store she had difficulty both standing and sitting for long

periods because of pain in her hips. R. at 53-54.

### 2. *Medical Expert Dr. Robert Marques's Testimony*

Dr. Marques testified about Ms. Jeffers' mental health. R. at 56-65. When asked by the

ALJ what condition Ms. Jeffers has, Dr. Marques responded that "we really don't have good

records." R. at 58. However, he went on to indicate that "[w]hat we do have states . . . that Ms.

Jeffers has had depression for a long period of time, has pain, and now has been diagnosed as

having ADD. . . ." *Id.* Ms. Jeffers' attorney pointed out that her treating physician, Dr. Gary

Marcotte, had submitted a mental RFC assessment, R. at 517-521, which indicated "poor/none"

for "ability to understand, remember, and carry out simple job instructions," as well as for other

categories included on the form. R. at 64-65. Dr. Marques responded that, "The trouble is we

don't have a record that says why he thinks this." R. at 65. Based on the record available, Dr.

Marques testified that he did not believe her mental health issues met or medically equaled one

of the listed impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 59. When the ALJ

asked Dr. Marques about his opinion regarding the Part B criteria of 20 C.F.R. Part 404, Supbart

P, Appendix 1, he responded, "Moderate impairment in the activities of daily living[,] . . .

probably mild impairment to social functioning. Moderate impairment in persistence and pace."

*Id.* Dr. Marques testified that he presumed "our ADHD diagnosis is correct." *Id.* As to Ms.

Jeffers' mental work related restrictions, Dr. Marques indicated, "[Ms. Jeffers] probably would

do better in a low stimulus environment. If her physical condition can tolerate it, repetitive unskilled work where she wouldn't be overly stressed." *Id.*

### 3. *Medical Expert Dr. Larry Kravitz's Testimony*

Dr. Kravitz testified at a January 17, 2008, hearing at which Ms. Jeffers was not present. R. at 74. Before giving his testimony as to his opinion of whether Ms. Jeffers had a condition that meets or medically equals one of the listed impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1, Dr. Kravitz described evidence in the record as to Ms. Jeffers' condition. R. at 75-77. Dr. Kravitz pointed to the October 10, 2007, letter from Dr. Faisal, R. at 509, the November 1, 2005, letter from Clinical Social Worker Shirley McDonald, R. at 325-327, and the October 27, 2005, Activities of Daily Living report submitted by Ms. Jeffers' sister-in-law. R. at 211-213. Dr. Kravitz testified that the case was difficult because "we have very little current evidence," but said that,

> [I]f I had to offer an opinion based on what we have, the social worker report in 11/05 is, is fairly consistent with [Dr. Faisal's letter], just much more detail. And the . . . sister-in-law's report is, is consistent with the other two reports, so while the file's not ideally documented . . . I would say the claimant had a severe impairment that did not meet or equal a listing. I would say that based on the evidence provided that she had moderate impairments in ADL, social functioning, and concentration, pace, persistence. And that as far as being able to sustain simple, routine work like tasks, again, . . . without current testimony of daily activities . . . I'd find it hard to believe that she would've consistently or would consistently even currently be capable of persistently [sic] within competitive work standards and handling ordinary levels of stress on a consistent basis.

R. at 77.

The ALJ pointed out that Ms. Jeffers' DLI in this case was September 30, 2003, and asked Dr. Kravitz if his opinion would extend back to that time period. R. at 78. In response, Dr. Kravitz testified that, "I would find that . . . those severity ratings could . . . reasonably be found to have existed as of the DLI, would not go back prior to the DLI. So as of the date of the

DLI." *Id.* The ALJ asked if his opinion for that time period would include the same limitations "in terms . . . of being unable to complete a regular work day?" *Id.* Dr. Kravitz responded, "Right. And . . . prior to that point I would say the evidence is insufficient . . . ." *Id.*

### 4. *Vocational Expert Thomas Grzesik's Testimony*

Mr. Grzesik testified that Ms. Jeffers' sales attendant[1] position was considered light work, but was medium work as she performed it. R. at 67. He indicated that her work at the antiques store that she owned was similarly light in physical demand, but medium work as she performed it. *Id.* He described that work as a skilled position. *Id.* Finally, referring to her work as a restaurant supervisor, Mr. Grzesik testified that the work was semiskilled, was again light in physical demand, but was medium work as she performed it. *Id.*

The ALJ posed a hypothetical for Mr. Grzesik of an individual of the claimant's same age, education and work experience who would be limited to light work and in the kinds of low stimulus environments Dr. Marques suggested Ms. Jeffers would "do better" in.[2] R. at 68. After Mr. Grzesik indicated that such a hypothetical individual would not be able to perform Ms. Jeffers' past work, the ALJ asked Mr. Grzesik if such an individual could perform any other jobs in the national economy. *Id.* Mr. Grzesik testified that such an individual could perform a number of jobs classified as light work, including electronics worker, production assembler, and small products assembler. *Id.* In contrast, in response to questions from Ms. Jeffers' attorney, Mr. Grzesik testified that a hypothetical individual with the same mental and physical RFC as

---

[1] Although unclear in the record, it appears the "sales attendant" job refers to Ms. Jeffers work at a Shell gas station in Georgia in 1997-1998. *See* R. at 66-67.

[2] Although the heading of this portion of the transcript indicates "REEXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:" it is clear that the ALJ and not Ms. Jeffers' attorney posed this hypothetical because Mr. Grzesik continually began his responses with "Your Honor," and after these responses the ALJ allowed Ms. Jeffers' attorney to question Mr. Grzesik.

those submitted by Dr. Gary Marcotte for Ms. Jeffers would not be able to perform any of Ms. Jeffers' past work. R. at 69. He also testified that such an individual would not be able to perform any work in the national economy. *Id.*

D. *The ALJ's Decision*

On August 6, 2008, the ALJ found that Ms. Jeffers was not disabled under sections 216(i) and 223(d) of the Social Security Act. R. at 16.

The ALJ first found that Ms. Jeffers had not engaged in substantial gainful activity during the period between her August 1, 2003, alleged onset date and her September 30, 2003, DLI. R. at 17. The ALJ then found that Ms. Jeffers had one severe impairment: a history of three arthroscopic surgeries on her knees. R. at 18. However, the ALJ found that Ms. Jeffers did not have a severe neurological impairment. *Id.* The ALJ based her finding on an August 28, 2003, visit to Dr. Fagan, a neurologist. *Id.* Dr. Fagan noted an MRI showed some bulging but no herniation of any disc, and his physical examination of Ms. Jeffers was unremarkable. *Id.*

Relying on treatment records from Dr. Marcotte, the ALJ also concluded that, through the DLI, Ms. Jeffers had non-severe depression and anxiety that was well managed with medication. R. at 18-19. Indeed, although the ALJ acknowledged that Ms. Jeffers was found to be depressed and anxious in a visit with Dr. Marcotte in September 2002, and that there was evidence of her mental health issues subsequent to April 2004, she emphasized that nothing was mentioned about mental problems in visits with Dr. Marcotte in January, March, May, June, and July of 2003. *Id.* The ALJ also dismissed Ms. Jeffers' alleged attention deficit disorder and fibromyalgia for a lack of testing or other corroborating evidence. R. at 19. Further, the ALJ concluded that "the claimant's alleged osteoarthritis, back problem, anemia, diabetes, herniated disc, and constant

pain for which she wears a pain patch, are not shown to have presented any significant or additional limitations on the claimant's ability to perform basic work-related activities." *Id.*

Next, the ALJ found that Ms. Jeffers did not have a medical condition that met or medically equaled one of the listed impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 20. In making this determination, the ALJ indicated that she had no reason to disagree with the opinions of state agency medical consultants and the opinions of the medical experts. *Id.* Although the ALJ had found that Ms. Jeffers suffered short periods of incapacity following her three knee surgeries, she indicated that "the medical records from treating sources did not describe any ongoing problems . . . ." *Id.* Also, the ALJ noted that "for the reasons described above, I did not find the claimant to have a severe mental impairment on or prior to the date last insured." *Id.*

The ALJ then found that, through the DLI, Ms. Jeffers had the RFC to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a), with standing and walking limited to less than six hours in an eight-hour workday.[3] R. at 21. The ALJ afforded little weight to the letters submitted to the Social Security Administration by Dr. Szarmach and Ms. McDonald. R. at 22-23. The ALJ faulted Dr. Szarmach's letter because he made conclusory statements that Ms. Jeffers was "fairly incapacitated, and unable to work." R. at 22. The ALJ explained that such statements are not "medical opinions . . . entitled to controlling weight." *Id.* Further, the ALJ gave little weight to Dr. Szarmach's opinions because he did not support them with clinical or objective medical evidence. *Id.* Similarly, the ALJ said that "[l]ittle weight can

---

[3] The ALJ's reference to "six hours" appears to be a typographical error because the Commissioner has determined that sedentary work should not require more than a total of two hours of standing or walking in an eight-hour day. *See Walker v. Bowen*, 834 F.2d 635, 642 (7th Cir. 1987) (citing SSR 83-10).

be given" to Ms. McDonald's assessment of Ms. Jeffers' condition because it was "inconsistent with treatment records during the period in question, which indicate the claimant's depression was stable and well controlled until March and April 2004 . . . ." R. at 23.

The ALJ afforded no weight to RFC assessments submitted by Drs. Marcotte and Anwar in April and July of 2008, respectively. R. at 21-22. According to the ALJ, Dr. Marcotte's RFC assessments "would preclude competitive work activity from either a physical standpoint or a mental standpoint." R. at 21. Likewise, according to the ALJ, Dr. Anwar's RFC assessment "would essentially preclude the claimant from even sedentary work." R. at 22. The ALJ afforded no weight to Dr. Marcotte's RFC assessments because "[t]he only medical finding he cited to support his assessment was positional swelling." *Id.* The ALJ also noted that "the limitations and restrictions currently present, which are likely the basis for [Dr. Marcotte's] assessments, were not present at a disabling level through the [DLI]." *Id.* The ALJ afforded no weight to Dr. Anwar's RFC assessment "since he did not start seeing the claimant until late 2005 or 2006, more than two years after the expiration of her insured status." R. at 23.

Next, the ALJ found Ms. Jeffers' statements and testimony concerning the intensity, persistence, and limiting effects of her mental and physical impairments "not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below." R. at 21. Specifically, the ALJ explained that "it is difficult to determine the severity of her functional limitations based on her testimony" because Ms. Jeffers' DLI was more than four years prior to the hearing in this case. *Id.* The ALJ, therefore, placed greater reliance on contemporaneous medical evidence, finding that such evidence "does not establish an inability to perform sedentary work." *Id.* Regarding Ms. Jeffers' alleged depression, the ALJ reiterated her earlier finding that the problems appeared to have been controlled by medication,

and did not worsen until well after the DLI. *Id.* The ALJ stated that "[T]he first evidence of a panic attack was in March 2005, more than 18 months after expiration of her insured status." *Id.*

The ALJ concluded that Ms. Jeffers could not perform her past work, but that given her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Ms. Jeffers could have performed. R. at 23.

## STANDARD OF REVIEW

This Court will reverse the findings of the Commissioner only if they are not supported by substantial evidence or are a result of legal error. 42 U.S.C. § 405(g); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed.2d (1971). In making its substantial evidence determination, this Court will review the entire administrative record, but will not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner. *Clifford*, 227 F.3d at 869. Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls on the Commissioner, not the Court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). However, the Court will not simply "rubber stamp" the Commissioner's decision without a critical review of the record, *Clifford*, 227 F.3d at 869, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

## SOCIAL SECURITY REGULATIONS

The Social Security regulations require an ALJ to perform a familiar five-step inquiry to determine whether a claimant has met her burden of establishing a disability. *See* 20 C.F.R. § 404.1520. This involves a sequential evaluation: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. pt. 404, subpt. P, App. 1; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is unable to perform any other work in the national economy. *Zalewski v. Heckler*, 760 F.2d 160, 162 n. 2 (7th Cir. 1985). An affirmative answer leads to the next step, or, on steps three and five, to a finding that the claimant is disabled. *Id.* A negative answer at any step, other than step three, stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* If a claimant reaches step five, the burden of proof shifts to the Commissioner to establish that the claimant is capable of performing work in the national economy. *Clifford*, 227 F.3d at 868 (citing *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)).

## DISCUSSION

Ms. Jeffers' complaint alleges that the ALJ committed reversible error in denying her claim by issuing a decision that contained errors of law and that was not supported by substantial evidence. Ms. Jeffers further alleges that the Appeals Council erred in declining review of the ALJ's decision because the decision allegedly included errors of law and was not supported by substantial evidence. Ms. Jeffers first argues that the ALJ improperly afforded too little weight to the opinions of her treating physicians, and that the ALJ's RFC finding had no support in the record. Second, Ms. Jeffers argues that the ALJ's decision to discredit her statements and testimony was flawed because it was based on circular reasoning and was not supported by

20

substantial evidence. Third, Ms. Jeffers argues that the ALJ's use of the medical-vocational guidelines was inappropriate because the ALJ's underlying RFC assessment was flawed, and because she suffers from non-exertional limitations that preclude use of the guidelines. The parties also disagree as to the relevant time period when Ms. Jeffers must have established that she was disabled, an issue the Court turns to first.

A. *Relevant Time-period*

This case is unique in that Ms. Jeffers' DLI is only sixty-one days after her alleged onset date of August 1, 2003. The Commissioner argues that, because Ms. Jeffers was working prior to August 1, 2003 - and thus, "not disabled," according to the Commissioner - she must prove that she became disabled during this sixty-one day period. The Commissioner maintains that the most probative evidence is the contemporaneous evidence of Ms. Jeffers' condition during the sixty-one day period. Further, the Commissioner asserts that Ms. Jeffers' reliance on any medical evidence prior to August 1, 2003, is misplaced because the fact that she worked until August 1, 2003, means she was not disabled. Ms. Jeffers responds that she must only establish that she was disabled as of her DLI, that her part time work attempt during 2003 did not establish that she was "not disabled," and that medical evidence both prior to and after the sixty-one day period is probative of her disabilities.

The Court disagrees with the Commissioner's assertion that Ms. Jeffers must prove she became disabled during the sixty-one day period due to her work history. The fact that a person has a job does not prove that she is not disabled. *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003) (noting that "[She] may have a careless or indulgent employer or be working beyond [her] capacity out of desperation."). Here, Ms. Jeffers testified that she operated an antiques store until July 2002, but closed it because she was too sick. R. at 39. From February to August

1, 2003, Ms. Jeffers worked at a furniture store run by a friend of a friend who understood her condition. R. at 38. She was only able to work there two to three days a week for three or four hours a day. *Id.* This set of facts indicates to the Court the possibility that Ms. Jeffers worked for an "indulgent employer." Thus, to receive disability insurance benefits, Ms. Jeffers must prove only that she was disabled on or before the date her insured status expired, and that her disability had lasted or was expected to last for twelve consecutive months. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (citing *Meredith v. Bowen*, 833 F.2d 650, 655 (7th Cir. 1987)); 20 C.F.R. § 404.1527(a)(1).

The Court does not agree with the Commissioner that reliance on medical evidence prior to August 1, 2003, is misplaced. Even if Ms. Jeffers was not disabled prior to August 1, 2003, consideration of medical evidence both prior to and following that time is both appropriate and necessary. 20 C.F.R. § 404.1520(a)(3) (The ALJ is to consider *all* evidence in a case record in making a decision or determination whether a claimant is disabled) (emphasis added). Such longitudinal consideration of medical evidence is particularly important in this case, where Ms. Jeffers' knee and back problems have been described by her treating physicians as degenerative. *See* R. at 310 (knee), 660 (back). Thus, while medical evidence near-in-time and during the sixty-one day period will likely be most useful for the ALJ's determination as to whether Ms. Jeffers was disabled as of the DLI, consideration of evidence prior to and following that period is also relevant.

B. *RFC Finding*

Ms. Jeffers argues that the ALJ improperly rejected an entire line of medical evidence – the opinions and medical records of her treating physicians – in making her RFC finding, by failing to afford any weight to the opinions of Drs. Marcotte and Anwar, and by affording little

22

weight to Dr. Szarmach's opinion. Additionally, the Court will address the ALJ's treatment of Ms. McDonald's letter. Further, Ms. Jeffers argues that the ALJ's physical RFC assessment that Ms. Jeffers was able to sustain the full range of sedentary work was not supported by substantial evidence.

A treating physician's opinion about the nature and severity of an impairment is entitled to controlling weight if it is well supported by medical evidence in the record and is not inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2). Where an ALJ has not afforded controlling weight to a treating physician's opinion because it is not supported by medical evidence, or is inconsistent with evidence of record, "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [the Social Security regulations]." SSR 96-2p, 1996 WL 374188, *4 (July 2, 1996). The relevant factors that must be weighed include,

> (1) Examining relationship . . .
> (2) Treatment relationship . . .
>   (i) Length of the treatment relationship and . . . frequency of examination . . .
>   (ii) Nature and extent of the treatment relationship . . .
> (3) Supportability . . .
> (4) Consistency . . .
> (5) Specialization . . .
> (6) Other factors . . . .

20 C.F.R. § 404.1527(d). The ALJ must evaluate every medical opinion, whether from a treating source or not, according to these factors. *Id.*

### 1. *The ALJ Failed to Adequately Justify Giving Little or No Weight to the Treating Sources*

#### a. *Dr. Marcotte*

First, Ms. Jeffers argues that the ALJ's rejection of Dr. Marcotte's RFC assessment is not supported by substantial evidence. Ms. Jeffers insists that the ALJ ignored the fact that Dr.

Marcotte submitted extensive medical records, dating back to September 2002, which support his RFC assessments. As an example, Ms. Jeffers points to a May 16, 2003, consultation report in which Dr. Suk[4] reports prominent degenerative changes and degenerative arthritis. R. at 490. According to Ms. Jeffers, it is not clear that her knee surgery would correct the degenerative arthritis identified by Dr. Suk. Thus, Ms. Jeffers argues that these conditions provide medical support from the relevant time period for Dr. Marcotte's RFC assessments. The Commissioner responds that, because Dr. Marcotte failed to sufficiently identify medical findings to support his RFC assessments, they were reasonably rejected by the ALJ. The Commissioner acknowledges that Dr. Marcotte noted "positional swelling" as a basis for his physical RFC assessment, but argues that such "positional swelling" is not supported by office or treatment notes from Dr. Marcotte. Further, the Commissioner argues that, for the time period at issue, Dr. Marcotte treated Ms. Jeffers for routine maladies only. The Commissioner points to *Schroeter v. Sullivan* for the proposition that a treating physician's opinion is entitled to controlling weight only where he treats the condition that causes the impairment. 977 F.2d 391, 395-396 (7th Cir. 1992). Because none of the conditions that Dr. Marcotte treated Ms. Jeffers for would support a disability finding, the Commissioner argues that the ALJ's decision to give no weight to his RFC assessments was justified.

The ALJ's stated reasons for affording no weight to Dr. Marcotte's opinion do not justify that conclusion. According to the ALJ,

---

[4] The record appears to indicate that Dr. Marcotte referred Ms. Jeffers to Dr. Suk for knee surgery. *See* R. at 459.

The only medical finding he cited to support his assessment was positional swelling. And for the reasons explained above,[5] the limitations and restrictions currently present, which are likely the basis for his assessments, were not present at a disabling level through the [DLI].

R. at 22. As noted by the Commissioner, Dr. Marcotte did only indicate "swelling - positional" on the RFC assessment form as the medical findings on which his assessment was based. R. at 515. However, timely evidence in the record submitted by Dr. Marcotte would tend to provide support for his physical RFC assessment. For example, in a visit on May 12, 2003, Ms. Jeffers complained of back pain and pain running down her left leg. R. at 459. Also, contemporaneous evidence in the record, overlooked or ignored by the ALJ, would tend to provide support for Dr. Marcotte's mental RFC assessment. Specifically, at multiple points in her decision, the ALJ indicated that Ms. Jeffers' mental health problems appeared stable until 2004.[6] However, on August 27, 2003, Ms. Jeffers went to the emergency room and was diagnosed as having experienced a panic attack. R. at 284. This represents contemporaneous evidence that contradicts the ALJ's statements with respect to Ms. Jeffers' mental health, and would seemingly tend to support Dr. Marcotte's mental RFC assessment. Further, even if the ALJ concludes that Dr. Marcotte's RFC assessments are not supported by medical evidence, she must still explain why the relevant factors found at 20 C.F.R. § 404.1527(d), suggest his opinion is entitled to no weight.

The Court also disagrees with the Commissioner's reading of *Schroeter*. In that case, the Commissioner argued that the ALJ's finding that a claimant was not disabled was supported by

---

[5] The ALJ is presumably referring to her finding that through the DLI, Ms. Jeffers had only one severe impairment: namely, a "history of three arthroscopic surgeries on her knees . . . ." R. at 18.

[6] *See* R. at 23 ("[T]reatment records during the period in question . . . indicate that [Ms. Jeffers'] depression was stable and well controlled until March and April 2004, with no mention of mental problems . . . during 2003."; R. at 21 ("The first evidence of a panic attack was in March 2005 . . . .").

substantial evidence, including the opinion of the claimant's dermatologist that she had no restrictions on her ability to walk. *Schroeter*, 977 F.2d 391 at 395-396. Because the court found no evidence that the dermatologist "knew of-much less treated" the claimant's foot problem, the court found that the dermatologist's opinion was limited to the condition for which he was treating the claimant. *Id.* at 396.

Dr. Marcotte is distinguishable from the specialist-dermatologist in *Schroeter*, because he had been Ms. Jeffers' family physician for several years before submitting his RFC assessment. Also, unlike the specialist-dermatologist in *Schroeter*, Dr. Marcotte clearly knew of the conditions that Ms. Jeffers has indicated cause her limitations because she complained about them in visits to his office. For example, at a visit on October 16, 2002, Ms. Jeffers complained of increased depression and anxiety. R. at 456. Similarly, at a visit just prior to Ms. Jeffers' second left knee surgery, she complained of back pain and pain running down her left leg. R. at 459. Finally, in contrast to the specialist-dermatologist in *Schroeter*, Dr. Marcotte has treated Ms. Jeffers for the conditions that she alleges cause her limitations by prescribing medications such as Paxil and Xanax. R. at 456. Dr. Marcotte also treated Ms. Jeffers by providing referrals to other doctors for matters outside his expertise, such as the knee surgeries with Dr. Suk. R. at 459.

The ALJ fails to explain why she believes the limitations and restrictions *currently* present are "likely the basis for" Dr. Marcotte's assessments. Although Dr. Marcotte did not submit his physical and mental RFC assessments until April 2008, more than four years after the DLI, he had been Ms. Jeffers' treating physician since 2002. The opinion of a treating source such as Dr. Marcotte, who has seen a patient "long enough to have obtained a longitudinal picture" of the patient's impairment is entitled to greater weight than the opinion of a nontreating

26

source. 20 C.F.R. § 404.1527(d)(2)(i). Surely, over the six years he treated Ms. Jeffers prior to submitting the RFC assessments, Dr. Marcotte had developed such a longitudinal picture. Thus, application of this particular factor would tend to suggest lending at least some weight to Dr. Marcotte's opinion. The Court is not persuaded that the ALJ's speculative and conclusory statement that Ms. Jeffers' 2008 conditions were "likely the basis for" Dr. Marcotte's opinions overcomes the weight to be afforded a treating physician like Dr. Marcotte who had established a longitudinal picture of Ms. Jeffers' conditions.

Moreover, the ALJ failed to explain why Dr. Marcotte's RFC assessments are entitled to no weight, despite evidence in the record that could be found to be consistent with those assessments. *See* 20 C.F.R. § 404.1527(d)(4). In this regard, and without expressing an opinion on the extent of the consistency, the Court believes that the ALJ should have considered the extent of consistency between Dr. Marcotte's RFC assessments and Dr. Anwar's assessments, and between Dr. Marcotte's RFC assessments and Ms. Jeffers' testimony regarding her limitations prior to her alleged onset date and DLI.

In short, the ALJ fails to explain how the factors found at 20 C.F.R. § 404.1527(d), which would seemingly tend to lend significant weight to the opinion of a long-time treating source like Dr. Marcotte – whose opinion finds at least some support in the record – counsel instead a complete rejection of his assessments. Thus, because the ALJ did not adequately explain her reasons for affording no weight to Dr. Marcotte's assessments, she failed to "provide a logical bridge from the evidence to [the] conclusion." *Clifford*, 227 F.3d at 872.

    b.  *Dr. Anwar*

Next, Ms. Jeffers argues that the ALJ erred in affording no weight to Dr. Anwar's RFC assessment, because, contrary to the ALJ's assertion, Dr. Anwar began seeing Ms. Jeffers in May

2003, well before the DLI. Ms. Jeffers notes that Dr. Anwar administered several transforaminal epidural steroid injections in the summer of 2003. She also indicates that, on June 5, 2003, Dr. Anwar diagnosed her with left lumbar radiculopathy, sciatica, L5-S1 disc protrusion with a severe lumbar strain, severe bilateral sacroilitis, and facet arthropathy. R. at 453. As with Dr. Marcotte, the Commissioner argues that the ALJ reasonably rejected Dr. Anwar's opinions because Dr. Anwar failed to identify the medical basis for his opinions on the RFC assessment form. While acknowledging that the ALJ mistakenly stated that Ms. Jeffers did not start seeing Dr. Anwar until after her DLI, the Commissioner argues that the ALJ could have reasonably afforded no weight to Dr. Anwar's opinions because the medical records he submitted failed to support the dramatic limitations in his RFC assessment. Further, the Commissioner contends that, as a matter of law, the diagnoses identified by Dr. Anwar do not establish the severity of impairments or identify functional limitations resulting from such impairments.

General principles of administrative law preclude the Commissioner's attorneys from advancing arguments in support of the agency's decision that were not made by the ALJ in her decision. *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95, 63 S. Ct. 454, 87 L. Ed. 626 (1943); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *Pinto v. Massanari*, 249 F.3d 840, 847-48 (9th Cir. 2001); *Fargnoli v. Halter*, 247 F.3d 34, 44 n. 7 (3d Cir. 2001)). Although the Commissioner hypothesizes reasons for which the ALJ *could have* rejected Dr. Anwar's RFC assessment, the actual reason the ALJ gave was that, "[n]o weight can be given to the assessment of Dr. Anwar since he did not start seeing the claimant until late 2005 or 2006, more than two years after the expiration of her insured status." This statement is untrue, because Dr. Anwar submitted treatment records dating back to May 2003. Although the ALJ notes that Dr. Anwar's records from 2006 indicate good

28

relief of her pain from the epidural steroid injections, in records from September 29, 2003, Dr. Anwar seemed to indicate that the relief Ms. Jeffers received from the injections was short lasting. R. at 449. Thus, as with Dr. Marcotte, the ALJ must adequately explain why the opinion of Dr. Anwar – a treating source – is not entitled to any weight.

### c. *Dr. Szarmach*

Finally, Ms. Jeffers argues that the ALJ failed to afford proper weight to Dr. Szarmach's opinion. Part of the ALJ's rationale for giving little weight to Dr. Szarmach's letter was that "[His] statements that [Ms. Jeffers] was fairly incapacitated, and unable to work . . . are not medical opinions . . . ." R. at 22. Ms. Jeffers argues that, based on the above statement, it can be inferred that the ALJ gave little weight to Dr. Szarmach's opinions because he is a chiropractic physician rather than a medical doctor. Further, Ms. Jeffers contends that the ALJ ignored the fact that Dr. Szarmach referred her to Dr. Anwar in April 2003, because her pain was no longer responding to his treatments and required more aggressive attention. Ms. Jeffers also insists that Dr. Szarmach's statements themselves were contemporaneous evidence of her limitations because he was treating her until May 2003. Ms. Jeffers finally notes that Dr. Szarmach's statements are consistent with the medical opinions submitted by Drs. Marcotte and Anwar.

According to the Commissioner, the ALJ reasonably afforded little weight to Dr. Szarmach's letter. The Commissioner argues that there is no basis for Ms. Jeffers' contention that it could be inferred that the ALJ rejected Dr. Szarmach's opinion because he is a chiropractor. Rather, the Commissioner asserts that the ALJ justifiably rejected Dr. Szarmach's opinion for specific reasons, including that 1) his statement that Ms. Jeffers was "unable to work" was not a medical opinion; 2) he failed to submit objective clinical or medical evidence to

support his opinion; nor was such evidence found in the record from other sources; and, 3) his letter was ambiguous regarding the varying severity of Ms. Jeffers' limitations.

Ms. Jeffers' suggestion that the ALJ's decision to afford little weight to Dr. Szarmach's opinion on these issues was based on his status as a chiropractor is purely speculative and finds no support in the record. The Court finds no error in the ALJ's decision not to afford controlling or great weight to that portion of Dr. Szarmach's opinion where he indicates that Ms. Jeffers "was fairly incapacitated, and unable to work or perform a variety of [activities of daily living] at that time . . . ." R. at 661. This statement represents an opinion on issues reserved to the Commissioner and is not entitled to any special significance. 20 C.F.R. § 404.1527(e)(3).

Although his opinion on issues reserved to the Commissioner is entitled to no weight, Dr. Szarmach did provide other opinions regarding his treatment of Ms. Jeffers' back condition. For example, Dr. Szarmach indicated that Ms. Jeffers has degenerative conditions, which had become bad enough by 2003 that he felt Ms. Jeffers needed treatment beyond what he was able to provide for her. R. at 660. The Commissioner is correct that Dr. Szarmach did not submit medical records to corroborate his opinions regarding Ms. Jeffers' conditions. However, the Commissioner is incorrect that Dr. Szarmach's opinions find no support in the record from other treating sources. For example, Dr. Szarmach's opinions appear consistent with the treatment records of Dr. Anwar in 2003 that were ignored by the ALJ. *See e.g.,* R. at 452-453 (noting, *inter alia*, left lumbar radiculopathy, sciatica, L5-S1 disc protrusion with a severe lumbar strain). Further, the Court disagrees with the ALJ's assessment of the letter as being "ambiguous . . . regarding the varying severity of her problems . . . ." R. at 22. The only point in the letter where Dr. Szarmach mentions varying severity is with respect to various injuries suffered by Ms. Jeffers that he treated her for. R. at 660. Thus, although Dr. Szarmach's opinions on issues

reserved to the Commissioner are entitled to no weight, the ALJ must re-examine the appropriate weight to be given the remainder of the letter.

### d. *Ms. McDonald*

Although not mentioned by Ms. Jeffers, the ALJ also afforded little weight to the letter submitted by Ms. McDonald, a clinical social worker who worked with Ms. Jeffers to alleviate her depression, anxiety, and on-going pain between 1994 and 1998, and after 2004. R. at 23. The ALJ reasoned that little weight should be given to Ms. McDonald's opinion because, "[I]t is inconsistent with treatment records during the period in question, which indicate that [Ms. Jeffers'] depression was stable and well controlled until March and April 2004, with no mention of mental problems at examinations with Drs. Marcotte at visits during 2003." *Id.* However, Ms. McDonald's opinion was not necessarily inconsistent with treatment records during the period in question, because the ALJ overlooked the fact that Ms. Jeffers suffered a panic attack that required emergency room treatment on August 27, 2003. R. at 284. Further, medical expert Dr. Kravitz testified that Ms. McDonald's opinion was consistent with other evidence in the record.[7] Because the ALJ ignored or overlooked the August 27, 2003, emergency room visit for a panic attack, the ALJ must re-examine the appropriate weight to be afforded to Ms. McDonald's opinions.

---

[7] Dr. Kravitz indicated, "[T]he difficulty in the case is that we have very little current evidence . . . But if I had to . . . offer an opinion based on what we have, [Ms. McDonald's report] in 11/05 . . . is fairly consistent with what [Dr. Faisal] is saying just much more detail. . . ." R. at 77.

## 2. *The ALJ's Physical RFC Assessment Was Not Supported by Medical Evidence*

Having rejected the RFC assessments submitted by Drs. Marcotte and Anwar, and having given little weight to Ms. Jeffers' other treating sources, the ALJ made her own RFC assessment, stating,

> For the period prior to the [DLI], I find that the claimant, given the three knee surgeries . . ., was limited to sedentary work, with standing and walking limited to less than six hours[8] in an eight-hour day. She did not, however, have any restrictions on the use of her upper extremities. In terms of the claimant's alleged depression . . . I find this problem to have been well controlled with medication and the severity of those problems appear to have significantly worsened around April of 2004, more than six months after the expiration of her insured status. The first evidence of a panic attack was in March 2005, more than 18 months after expiration of her insured status.

R. at 21. The first problem with the ALJ's RFC assessment is that an ALJ may not substitute her own judgment for that of a treating physician without relying on other medical evidence or authority in the record. *Clifford*, 227 F.3d at 870. Presumably, the ALJ was relying on the fact that at step three of her decision, she explained that she was, "[A]dopt[ing] the implicit opinions of the State agency medical consultants and the opinions of the medical expert," that Ms. Jeffers did not have an impairment that met or medically equaled a listed impairment. R. at 20. However, neither the medical experts nor the medical consultants provided opinions that would support the ALJ's RFC assessment. Unfortunately, the ALJ was not clear as to which medical expert's opinion she was adopting.[9] At the January 17, 2008, hearing, Dr. Kravitz testified that as of Ms. Jeffers' DLI, "[He would] find it hard to believe that she would've [sic] consistently or would consistently even currently be capable of persistently [sic] within competitive work

---

[8] *Supra*, note 2.

[9] Two different medical experts testified: Dr. Kravitz at the January 17, 2008 hearing, *See* R. 73, and Dr. Marques at the May 1, 2008 hearing. *See* R. 29.

standards and handling ordinary levels of stress on a consistent basis." R. at 78. At the May 1,

2008, hearing, Dr. Marques testified as to Ms. Jeffers' mental condition. R. at 59. He stated,

"[Ms. Jeffers] probably would do better in a low stimulus environment. If her physical condition

can tolerate it, repetitive unskilled work where shouldn't be overly stressed." *Id.* Presumably,

the ALJ intended to adopt Dr Marques' opinion, since it is more consistent with her eventual

finding that Ms. Jeffers could perform the full range of sedentary work. However, because Dr.

Marques only testified as to limitations Ms. Jeffers suffered related to her *mental* impairments,

the ALJ could only reasonably have adopted his opinion with respect to such limitations.

The state agency medical consultants submitted paperwork for the record indicating there

was insufficient medical evidence prior to Ms. Jeffers' DLI to make a determination as to the

severity of her claims.[10] R. at 364-79, 507-08. These assessments did not indicate that Ms.

Jeffers' conditions were not severe, but rather that the consultants could not determine their

severity because of the limited information in the record at that time. It is unclear what opinion

the ALJ could have "implicit[ly]" adopted from such assessments other than that no

determination could be made based on the record as it then existed.

Because the ALJ pointed to no medical evidence or authority to support her conclusion

that Ms. Jeffers was *physically* capable of performing the full range of sedentary work, the ALJ

had a duty to flesh out the record to support her decision. *Bailey v. Barnhart*, 473 F.Supp.2d

822, 839 (N.D.I.L. 2006) (holding that ALJ who had rejected available medical record upon

which to base an RFC assessment had a duty to call a medical advisor and/or obtain clarification

---

[10] A consultant specializing in mental conditions submitted paperwork on November 29, 2005. A consultant specializing in physical conditions submitted paperwork on November 28, 2005. On May 24, 2006, another consultant specializing in mental conditions affirmed the November 29, 2005 finding, writing that "there continues to be insufficient [medical evidence of record] in file." R. at 508.

of the record to support her decision).  By neglecting to flesh out the record in order to support her RFC assessment, the ALJ acted contrary to controlling case law that prohibits ALJ's from the temptation to "play doctor" and substitute their own independent medical findings for those found in the record.  *Rohan v. Charter*, F.3d 966, 970 (7th Cir. 1996).

Therefore, because the ALJ failed to adequately explain, consistent with 20 C.F.R § 404.1527(d), her reasons for affording little or no weight to the opinions of Ms. Jeffers' treating sources, and because there was no medical evidence or authority to support the ALJ's physical RFC assessment, the Court holds that the ALJ's RFC finding was not supported by substantial evidence.

C. *The ALJ's Credibility Determination*

Ms. Jeffers argues that the ALJ erred in discrediting her testimony with regard to the intensity, persistence, and limiting effects of her symptoms, because the ALJ's credibility determination relied on circular reasoning and was not supported by substantial evidence. According to Ms. Jeffers, because her testimony was supported by medical evidence in the record, the ALJ should have applied Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996), to make the credibility determination.  The Commissioner argues that Ms. Jeffers' testimony and allegations concerning her abilities focused on her current condition, and not her condition as it existed prior to her DLI.  Therefore, the Commissioner asserts, the ALJ reasonably placed greater reliance on contemporaneous medical reports, and such reports did not show that Ms. Jeffers was unable to perform sedentary work.

The Social Security Regulations provide the following guidance regarding an ALJ's credibility determination:

> We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you. Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

20 C.F.R. § 404.1529(c)(4). In making her credibility determination, the ALJ must not only evaluate the claimant's statements in relation to the objective medical evidence, but also in relation to several other factors, including: the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; as well as other factors. SSR 96-7p; 20 C.F.R. § 404.1529(c)(3). SSR 96-7p requires that,

> The [credibility determination] must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Further, SSR 96-7p provides that "allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence." Rather, the absence of objective medical evidence supporting an individual's statements is only one factor that should be evaluated in the credibility determination, and it should be evaluated in the context of all of the evidence. *Id.*

An ALJ's credibility determination will generally not be overturned unless it is "patently wrong." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (citing *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)). However, courts must also critically evaluate the record as a whole,

and must set aside an ALJ's decision if her findings of fact are unreliable because of serious mistakes or omissions. *Cage v. Apfel*, 2000 WL 1206710 at *4 (S.D.IN. 2000) (citing *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). Here, the ALJ discredited Ms. Jeffers' testimony because it was inconsistent with the RFC assessment that the ALJ developed for Ms. Jeffers. R. at 21. The ALJ also wrote that, because the DLI was several years ago, she placed greater emphasis on contemporaneous medical reports than on Ms. Jeffers' testimony. *Id.* The ALJ reasons that, because the contemporaneous medical evidence does not establish an inability to perform sedentary work, Ms. Jeffers' statements to the contrary are not credible. *Id.*

The Court finds that the ALJ's first rationale for discrediting Ms. Jeffers' statements – that they were inconsistent with the ALJ's RFC assessment - was "patently wrong" because, as discussed *supra*, the ALJ's RFC assessment itself was not supported by substantial evidence. Ms. Jeffers testified that in 2002, she could no longer stand the pain in her back, R. at 52, and that she received surgical injections for her back pain in 2003, R. at 53. Ms. Jeffers also testified that she could not stand or sit for long periods of time at her job at the furniture store in 2003. R. at 53-54. Presumably these are the kinds of statements the ALJ found to be inconsistent with her RFC assessment. While such statements may have been inconsistent with the faulty RFC assessment that the ALJ devised, they are not necessarily inconsistent with the medical evidence in the record that the ALJ overlooked. Such evidence would include the records submitted by Dr. Anwar, which indicate that he was in fact treating Ms. Jeffers for her back condition in 2003, and that the relief she received from the treatments was short lasting.

The ALJ's second justification for her credibility determination – that contemporaneous medical evidence did not establish an inability to perform sedentary work – is inconsistent with SSR 96-7p. The ALJ's rationale is immediately suspect because she failed to consider

contemporaneous medical evidence from Dr. Anwar, and from Ms. Jeffers' August 27, 2003, visit to the emergency room due to a panic attack, which could reasonably be found to support Ms. Jeffers' statements. Additionally, the regulations clearly indicate that the claimant's statements cannot be dismissed solely on the basis of the absence of objective medical evidence. Here, the ALJ did not adequately discuss why, when evaluating the record as a whole, the several other factors that she was required to consider in making her credibility determination were outweighed by the alleged lack of contemporaneous medical evidence. Finally, the Court disagrees with the Commissioner's assertion that Ms. Jeffers' testimony and allegations concerning her abilities focused on her current condition, and not her condition as it existed prior to her DLI. Although the Commissioner does not point to any specific part of the record that supports this assertion, the Court takes notice that much of Ms. Jeffers' testimony at the May 1, 2008, hearing concerned her condition prior to her DLI.[11] Therefore, because the ALJ's justifications for her credibility determination were "patently wrong," as well as inconsistent with what is required under applicable Social Security regulations, the ALJ must revisit her credibility determination on remand.

D. *Use of the Medical-Vocational Guidelines*

Ms. Jeffers argues that the ALJ erred in using the Medical-Vocational Guidelines ("the grid") to support her conclusion that Ms. Jeffers is not disabled. The thrust of Ms. Jeffers' argument is that the ALJ's RFC assessment, upon which application of the grid is based, was not supported by substantial evidence. Further, Ms. Jeffers argues that the ALJ failed to take into account evidence of her depression, including the fact that she had been prescribed medication to treat it, and the fact that both state medical experts identified limitations to Ms. Jeffers' ability to

---

[11] *See e.g.* R. at 41-54.

sustain sedentary work. Ms. Jeffers argues that her depression represents a non-exertional limitation that precludes application of the grid. Finally, Ms. Jeffers argues that the ALJ failed to consider the combined effects of her various ailments. The Commissioner responds that there was no evidence of Ms. Jeffers' mental condition during what the Commissioner argues is the relevant period: between her alleged onset date and her DLI. Further, the Commissioner contends that the mere fact that Ms. Jeffers was taking anti-depressant and anti-anxiety medication does not establish a severe mental impairment. Finally, as to the two medical experts who testified, the Commissioner first argues that Dr. Marques' testimony about Ms. Jeffers mental limitations was consistent with the particular grid guideline that the ALJ relied on. The Commissioner then calls into question the basis for Dr. Kravitz's testimony that he would find it hard to believe Ms. Jeffers would have been capable of persisting within competitive work standards and handling ordinary levels of stress on a consistent basis.[12]

An ALJ may not rely on the grid to direct a finding of "disabled" or "not disabled" when "the evidence does not support a finding that the claimant is capable of performing the express physical exertion requirements for that type of work or [when] some other non-exertional impairment significantly diminishes the claimant's ability to do that work or because of a combination of both factors." *Smith v. Schweiker*, 735 F.2d 267, 271 (7th Cir. 1984). Examples of non-exertional limitations found in the Social Security regulations include:

(i) . . . difficulty functioning because you are nervous, anxious, or depressed;

(ii) . . . difficulty maintaining attention or concentrating;

_____

[12] "Indeed, the fact that Dr. Kravitz could not bring himself to give [Ms. Jeffers] the benefit of the doubt for any day prior to [the DLI], strongly suggests that there was no basis for giving [Ms. Jeffers] the benefit of the doubt the next day." *Defendant's Memorandum in Support of Motion for Summary Judgment* at 13.

(iii) . . . difficulty understanding or remembering detailed instructions;

. . .

(vi) . . . difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching.

20 C.F.R. § 404.1569a(c)(1). Non-exertional limitations will only preclude use of the grid when they eliminate the full range of employment opportunities at the specified exertion level. *See Warmoth v. Bowen*, 798 F.2d 1109, 1101 (7th Cir. 1986) (holding use of the grid inappropriate when a claimant's non-exertional limitations restrict the full range of employment opportunities that he is physically capable of performing). Because the Court has concluded that the ALJ's RFC assessment was not supported by substantial evidence, the first precondition for use of the grid – that a claimant can perform a full range of work at a given exertional level – has not been met. On remand, the ALJ must consider the aggregate effects of Ms. Jeffers' conditions in making a proper RFC assessment.[13] The Court also agrees with Ms. Jeffers that the ALJ overlooked medical evidence of non-exertional limitations.[14] Without pre-judging, the Court notes that such non-exertional limitations, if found to eliminate the full range of employment opportunities at a given exertional level, may independently preclude application of the grid. In light of the fact that the first precondition for application of the grid is not met, much of the Commissioner's argument on this point is moot, and this Court will not address the

---

[13] "While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." SSR 96-8p, 1996 WL 374184 (July 2, 1996); *See also Golembiewski*, 322 F.3d at 918.

[14] Including, but not limited to, her August 27, 2003 emergency room visit for a panic attack. R. at 284.

Commissioner's remaining arguments. In summary, on remand, the ALJ must reassess whether use of the grid is appropriate in this case.

## CONCLUSION

Upon review, the Court does not find that the ALJ's decision to deny Ms. Jeffers disability benefits is supported by substantial evidence. For the foregoing reasons, Plaintiff's motion is granted, Defendant's cross-motion is denied, and this case is REMANDED for further proceedings consistent with this opinion.

Date: November 19, 2010

ENTER:

ARLANDER KEYS

United States Magistrate Judge